U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 3 1 2012

CLERK, U.S. DISTRICT COURT
By _____
            Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

GALE SPROUSE-HUDSON,                §
                                    §
            Plaintiff,              §
                                    §
VS.                                 §   NO. 4:11-CV-470-A
                                    §
PATRICK R. DONAHOE,                 §
POSTMASTER GENERAL, UNITED          §
STATES POSTAL SERVICE,              §
                                    §
            Defendant.              §

MEMORANDUM OPINION
and
ORDER

Came on for consideration the motion of defendant, Patrick

R. Donahoe, Postmaster General of the United States, for summary

judgment as to all claims and causes of action brought against

him by plaintiff, Gale Sprouse-Hudson.  Plaintiff filed a

response to the motion, and defendant filed a reply.  Having

considered the motion, response, reply, summary judgment record,

and applicable legal authorities, the court concludes that the

motion should be granted.

I.

Plaintiff's Claims

Plaintiff initiated the above-captioned action on July 11,

2011, by filing her original complaint, which asserted claims for

retaliation and gender-based discrimination in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e).[1]
Plaintiff alleged that defendant discriminated against her due to
her participation in protected activity, and that defendant
created "a hostile environment which was so severe and pervasive
to have negatively effected [sic] Plaintiff's terms and
conditions of employment." Compl. at 7.

## II.

### The Motion for Summary Judgment

Defendant contends that he is entitled to summary judgment
because plaintiff is unable to establish a prima facie case for
retaliation, discrimination, or hostile work environment.[2]
First, defendant argues that plaintiff's retaliation claim is
deficient because, although she engaged in protected activity,
she did not suffer an adverse employment action and, even if she
had suffered an adverse employment action, she did not establish
a causal connection between such action and her protected
activity.  Second, defendant contends that plaintiff's hostile
work environment claim must fail because any harassment she
experienced was not related to her protected activity or to her

---

[1] Plaintiff's complaint alleges discrimination based on plaintiff's participation in a protected activity, and "a gender and retaliatory hostile environment." Defendant has structured his motion to address retaliation, hostile work environment, and gender-based discrimination in that order. The court will also address the claims in such order.

[2] The court notes that defendant has withdrawn his contention that plaintiff failed to make timely contact with an EEO Counselor and that plaintiff failed to timely exhaust her administrative remedies. Notice of Withdrawal, July 30, 2012.

gender, and was insufficiently severe or pervasive to establish such a claim.  Finally, defendant argues that plaintiff's claim for gender-based discrimination is deficient because she did not suffer an adverse employment action, she did not name any similarly situated employees with whom she could be compared, and she was treated no differently than similarly situated employees.

III.

Undisputed Facts

Plaintiff is a fifty-seven year old woman who, until recently, had been employed by the United States Postal Service ("USPS") for approximately twenty-seven years.  During the relevant time period, plaintiff was first employed as a Customer Relations Coordinator ("CRC") in the Arlington Main Post Office, a position that reported directly to Postmaster Wayne Saxton ("Saxton"), and then as a Supervisor of Customer Service ("SCS") at the Melear Post Office, a position that reported directly to Station Manager Joseph Burke ("Burke").  Plaintiff's CRC position involved providing administrative support for customer service programs and activities, communicating with the local business community and media, and working with members of the board of the Fort Worth Postal Customer Council ("PCC").  The SCS position was more delivery-oriented, and involved supervisory responsibility in delivery, collection, and distribution of mail at a particular station.

In October 2007, plaintiff's husband, Joseph L. Hudson ("Joseph"), who was also a USPS employee, filed an EEOC complaint that was later dismissed.  Plaintiff was named as a witness in Joseph's case, but no facts are included as to how plaintiff participated in the case or what, if any, information she provided.  Joseph's case was filed prior to the time Saxton or Burke were assigned to Arlington; however, Joseph's complaint was reinstated in March 2009, by which time the management officials named in such complaint had become direct reports to Saxton.  EEO investigative affidavits in Joseph's case were completed by Ernestine Gray, Todd Jeffcoat ("Jeffcoat"), and Gwen LaRue ("LaRue") on May 8, 2009, May 12, 2009, and May 13, 2009, respectively.  The excerpts of the affidavits provided in plaintiff's appendix list basic, generic information regarding Joseph, namely his status as male and his approximate age.  The agency's final decision in Joseph's case was issued August 17, 2009, which he appealed on September 21, 2009, and submitted a brief in support of such appeal on October 19, 2009.

On April 23, 2009, Saxton entered his comments on plaintiff's mid-year evaluation, covering her CRC duties, stating that she was an "exceptional contributor" and "continues to be a contributor to the success of the Arlington Post Office."  Pl.'s App. at 13-16.

In 2009, the USPS executed a "reduction in force" ("RIF"),

4

which affected approximately 15% of the Fort Worth District, and
abolished plaintiff's CRC position.  Plaintiff received a letter
on May 26, 2009, notifying her about such reduction in force, and
informing her that it was effective as of August 28, 2009.
Plaintiff was later offered a lateral reassignment by Saxton to a
vacant SCS position at the Melear station.  Plaintiff sent an
email to Saxton requesting the transfer, and she was subsequently
reassigned to the SCS position in Melear.[3]  Plaintiff accepted
the reassignment, and began working at the Melear station
September 3, 2009.

Prior to the reassignment, in February 2009, plaintiff
participated in a stamp show and used stamp stocks from the post
office in the show.  When an audit was conducted two months
later, it revealed a shortage of approximately $4,000, related to
the stamps used by plaintiff in the stock show.  Saxton called
plaintiff to a meeting in the presence of other managers on May
13, 2009, to inquire about the stamps and determine what had
happened to them.  Saxton told plaintiff and LaRue to conduct
another audit, which also revealed a shortage, after which Saxton
notified plaintiff that she would be held accountable for the
stamps.  Plaintiff later discovered the error that had led to the

---

[3] Plaintiff disputes that her position was eliminated by the RIF program, disputes that she was "offered" the lateral reassignment by Saxton, and claims to have been "bullied" by Saxton into sending the email and requesting the transfer. However, plaintiff provides no support for this contention and, as will be discussed in the analysis of her claims, such dispute is not material.  Pl.'s Br. at 3.

shortage, and notified Saxton that two other employees were responsible for such error.  No further action was taken against plaintiff with regard to the stamps.

On September 3, 2009, Saxton notified plaintiff that, as she was now an SCS in Melear, she would be reporting to the station manager at Melear, and would no longer be one of his direct reports.  Saxton then instructed her to give her post office cell phone to another supervisor who reported directly to him.  Later that day, plaintiff sent an email to the PCC Board members, notifying them that she had been reassigned, that she was no longer a direct report to Saxton, that she could no longer be reached at her previous telephone number, and that they could contact Saxton or Adam Trujillo ("Trujillo"), another supervisor, should they have any questions or needs.  One week later, on September 10, 2009, Saxton conducted an investigative interview regarding the email, stating that he believed plaintiff's email to be an ethical violation.  At the interview were plaintiff, Saxton, Trujillo, Burke, who was to become plaintiff's supervisor at her new position but attended the meeting as president of the National Association of Postal Supervisors, and a labor relations specialist.  After the interview, no further action was taken against plaintiff.

During plaintiff's first week at Melear, on September 8, 2009, she was the closing supervisor and was therefore

responsible for making sure all mail was dispatched from the facility for processing and delivery.[4]  Twenty pieces of Express Mail were left in the facility and had not been dispatched, thereby causing a "delivery failure" and causing the USPS to incur costs associated with such failure.  Plaintiff was given an investigative interview on September 25, 2009, regarding the delivery failure, and was issued a letter of warning on October 28, 2009, for "unsatisfactory performance arising from the incident."  Def.'s App. at 31-32, 44; Pl.'s App. at 7.  Plaintiff appealed to Burke, the station manager and her direct supervisor, apparently to remove the letter of warning from her record, stating in her appeal that she did not have proper training for the position, that the letter was issued nearly two months after the incident, and that she was being singled out for discipline. Her appeal was denied by Burke, who explained to plaintiff that the letter was justified, evidence supported it, she was supposed to have trained with Ram Subramanian ("Subramanian") but had failed to do so, and that "Management had no reason to single out any one person, the evidence led to the responsibility being with the closing supervisor for that day."  Def.'s App. at 46.

Plaintiff was placed on the Route Inspection Team ("RIT")

---

[4] There are disputes between plaintiff and defendant regarding the details of the delivery failure, the extent of plaintiff's training, and whether plaintiff's lack of training or knowledge was attributable to her supervisor(s) or to herself; however, such disputes are not of legal relevance for the analysis of plaintiff's causes of action.

when she arrived at Melear, and received one-on-one training from Donna Givens ("Givens"), who was postmaster of Hermleigh, Texas, and the RIT leader.  Givens reported that plaintiff could not adequately perform the work required, that Givens had to give plaintiff additional attention and supervision because of plaintiff's deficiencies, and that plaintiff knew she was unable to perform the work properly.  Givens notified Saxton of plaintiff's deficiencies, after which Saxton removed her from RIT.  The record reflects that two other employees, including at least one male, were also removed from RIT, and that three females and four males were retained on RIT.

Once plaintiff arrived at Melear, she continued performing CRC duties, which required some contact with Saxton, who requested weekly agendas from plaintiff and who regularly called Burke to inquire about what plaintiff was working on.

Plaintiff received an email on December 3, 2009, from Jeffcoat, which contained a joke that involved some vulgarities and sexual and religious references which plaintiff found objectionable and offensive.  The email had originated with Saxton, and eventually reached plaintiff through Jeffcoat.

Plaintiff applied for a lateral reassignment to leave Melear, and on December 5, 2009, she was hired for such lateral assignment, another SCS position at the Richardson post office in the Dallas district.  When she began her new post, she was unable

to access the USPS computer system until Saxton had approved the
transfer within the system, which Saxton failed to do until
approximately January 21, 2010.  Such process had previously
taken a shorter period of time for other employees who had
transferred.  At some point during her tenure at Melear or
Richardson, plaintiff began suffering from stress-related health
conditions, and later had a car accident on her way home from
work.  Shortly thereafter, plaintiff left her employment with
USPS through early retirement.

IV.

Analysis

A.  Applicable Summary Judgment Principles

Rule 56(a) of the Federal Rules of Civil Procedure provides
that the court shall grant summary judgment on a claim or defense
if there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law.  Fed. R. Civ.
P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247
(1986).  The movant bears the initial burden of pointing out to
the court that there is no genuine dispute as to any material
fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986).
The movant can discharge this burden by pointing out the absence
of evidence supporting one or more essential elements of the
nonmoving party's claim, "since a complete failure of proof
concerning an essential element of the nonmoving party's case

9

necessarily renders all other facts immaterial." <u>Id.</u> at 323.

Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. <u>Id.</u> at 324. <u>See also</u> Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 597 (1986).

B. <u>Retaliation</u>

    1. <u>Evidentiary Framework</u>

To evaluate claims of retaliation under Title VII, absent direct evidence, the court looks to the evidentiary burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). This framework requires plaintiff first to make out a prima facie case for retaliation. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993). If plaintiff makes out a prima facie case, a presumption of retaliation arises and the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for its actions. <u>Id.</u> at 506-07. If defendant meets this

burden of production, "any presumption of retaliation drops from the case" and the burden shifts back to plaintiff to prove that the employer's proffered reason is actually a pretext for retaliation.  Baker v. Am. Airlines, Inc., 430 F.3d 750, 755 (5th Cir. 2005) (internal citation omitted).  The plaintiff bears the ultimate burden to show that protected activity was a "but for" cause of the adverse employment action--that is, "that the adverse employment action taken against the plaintiff would not have occurred 'but for' her protected conduct." Septimus v. Univ. of Houston, 399 F.3d 601, 608 (5th Cir. 2005) (internal citation omitted).

        2. The Merits

        As plaintiff has presented no direct evidence of retaliation, the court considers her claims using the burden-shifting framework.  To establish a prima facie case of retaliation, plaintiff must demonstrate that (1) she participated in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action.  Taylor v. United Parcel Serv., Inc., 554 F.3d 510, 523 (5th Cir. 2008).

            a.  Participation in Protected Activity

        The parties do not dispute that plaintiff participated in protected activity, citing the fact that she was named as a

witness and participated in Joseph's EEOC proceedings to some
degree.  While the depth and degree of her participation is
unclear, and there is no "automatic standing" for plaintiff
simply because her husband engaged in protected activity, the
court assumes plaintiff has satisfied this element of her
retaliation claim.  See Holt v. JTM Indus., Inc., 89 F.3d 1224,
1226 (5th Cir. 1996).

     b.  Adverse Employment Action

For plaintiff to establish that she was subject to a
retaliatory adverse employment action, she must show that "a
reasonable employee would have found the challenged action
materially adverse, which in this context means it might well
have dissuaded a reasonable worker from making or supporting a
charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v.
White, 548 U.S. 53, 68 (2006).  This standard "is tied to the
challenged retaliatory act, not the underlying conduct that forms
the basis of the Title VII complaint."  Id. at 69.  Reassignment
may be actionable, and "whether a particular reassignment is
materially adverse depends upon the circumstances of the
particular case, and should be judged from the perspective of a
reasonable person in the plaintiff's position, considering all
the circumstances."  Id. at 71 (quoting Oncale v. Sundowner
Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

In plaintiff's response to defendant's motion for summary

judgment, plaintiff states within her "Argument & Analysis"
section: "the Defendant employer took a tangible adverse
employment action, discriminated against the employee; (Plaintiff
was threatened, yelled at and belittled, proposed terminations,
discipline)." Pl.'s Br. at 9.  Plaintiff provides more details
in her section entitled "Plaintiff Disputes Defendant's Statement
of Facts," which is better characterized as an argument.  Pl.'s
Br. at 3-8.  Plaintiff complains about her treatment by Saxton in
regards to (1) the missing stamps, (2) the investigative
interviews she was subjected to as a result of the delivery
failure[5] at Melear station and the email she sent to PCC Board
members, (3) the recommendation that she be removed, (4) her
removal from the RIT team, (5) the warning letter resulting from
the delivery failure and denial of her appeal to have the letter
removed from her record, (6) his verbal threats to her
employment, (7) the loss of her CRC position in Arlington
subsequent transfer to the SCS position at Melear, (8) his
monitoring of her activities after she began working as an SCS,
and (9) his failure to approve her transfer to Richardson in the
computer system in a timely manner.

First, plaintiff's complaints about Saxton's rude behavior
and verbal threats to her job cannot constitute adverse

---

[5] Plaintiff disagrees that such delivery failure actually occurred, disputing as much on the letter of warning she received and in her brief. Pl.'s Br. at 5; Def.'s App. at 44.

employment actions.   See Browning v. S.W. Research Inst., 288 F.
App'x 170, 179-80 (5th Cir. 2008) (finding that alleged
"badgering, harassing, and humiliating" behavior, verbal abuse,
and threats to employment were not retaliatory adverse employment
actions).   Along the same lines, verbal reprimands, such as the
meeting regarding the missing stamps and the investigative
interviews regarding her email and her delivery failure, are not
actionable employment actions.   See King v. Louisiana, 294 F.
App'x 97, 85-86 (5th Cir. 2008) (stating that even in the light
most favorable to the plaintiff, allegations of unpleasant work
meetings, verbal reprimands, and unfair treatment are not adverse
employment actions in the retaliation context).   Additionally,
Saxton's monitoring of plaintiff's duties and a failure to
approve plaintiff's transfer in the computer system cannot rise
to the level of an adverse employment action.

As for plaintiff's complaints that could potentially be
characterized as "challenged retaliatory acts" required by White,
and not "underlying conduct," such complaints are (1) the loss of
her position as a CRC and subsequent transfer; (2) her removal
from the RIT; (3) written recommendation of removal by Saxton;
and (4) letter of warning.   It is possible that such actions
could dissuade a reasonable employee from engaging in protected
activity, as each seems to affect either the employee's work
duties, ability to advance, or both.   However, generally

speaking, "a transfer that does not involve a demotion in form or substance cannot rise to the level of a materially adverse employment action." Sabzevari v. Reliable Life Ins. Co., 264 F. App'x 392, 396 (5th Cir. 2008). Still, the court need not engage in an extended analysis here, because plaintiff has failed to establish that the actions were causally connected to her participation in Joseph's EEOC action.

c. Causal Connection

As noted above, to establish a prima facie case of retaliation, plaintiff must establish that the adverse employment actions were causally connected to her participation as a witness in her husband's EEOC action. Plaintiff contends that the following timeline connects events from Joseph's EEOC action to perceived adverse events from her own action:

> April 29, 2009 an Investigator is assigned to [Joseph Hudson's] EEO and affidavits are sent out to three management officials in Arlington who were direct reports to PM Saxton. On May 5, 2009, PM Saxton yells at the Plaintiff in a demeaning and embarrassing manner in front of witnesses. App. 002. May 8, May 12, and May 13, 2009, the same three management officials sign and date their affidavits. May 13, 2009, PM Saxton calls the Plaintiff into his office to accuse of doing something with $4000 of money/stamps. Saxton yells and abuses the Plaintiff, asserting that he is holding her responsible. App. 002-003. August 17, 2009, the Defendant issues the Final Agency Decision in Joe Hudson's EEO case. **Plaintiff given Benjamin Award on August 29, 2009.** By September 3, 2009, Plaintiff is sent to Melear, not trained as a delivery supervisor, her postal phone taken away, and left to close the office alone. By September 10, 2009, ordered into an office, door locked, and Saxton threatening the Plaintiff and job for sending a professional email to

the PCC Board members to inform them of what phone
number they needed to now use.  App. 004-005.  By
September 15, 2009, Saxton submits paperwork to
terminate Plaintiff.  **Plaintiff given the "Southwest
Area Postal Person of the Year Award" on September 16,
2009.**  App. 006.  On September 21, 2009, Joe Hudson
files an appeal of the Agency's Final Decision with
EEOC.  Same day Plaintiff is called and informed that
Saxton wants to go forward with her termination.  By
September 25, 2009, Plaintiff is given a second
investigative interview regarding questionable Express
Mail.  App. 007.  Joe Hudson files his EEOC Appeal Brief
on October 19, 2009.  By October 28, 2009, the Plaintiff
is issued a Letter of Warning.  App. 008.

Pl.'s Br. at 7-8 (emphasis in original).  Interestingly,

plaintiff provides citations to her appendix for some of her

assertions, but fails to provide citations or evidence for

others, including her assertion that Saxton submitted paperwork

to have her terminated and that she was called and told that

Saxton wanted to go forward with her termination.  Further,

plaintiff provides little more than speculation that Saxton was

aware of Joseph's EEOC action, or that any of Saxton's conduct

related to such EEOC action.  There is nothing that connects

Saxton to Joseph other than the fact that three of Saxton's

subordinates filled out affidavits in Joseph's case.  Finally,

defendant notes that the actions plaintiff points out as adverse

occurred subsequent to "ordinary procedural activity" in Joseph's

case, and cannot be relied upon to establish a causal connection.

Def.'s Reply at 3-4.

Though temporal proximity may factor into a retaliation

claim, plaintiff must show more than suspicious timing to create

a genuine issue of material fact.  See Roberson v. Alltel Info.
Servs., 373 F.3d 647, 655-56 (5th Cir. 2004) (holding that when a
company-wide reduction in force took place, and plaintiff's only
evidence of a causal connection was that such reduction took
place after plaintiff's discrimination complaints, summary
judgment in favor of the employer was proper).  Furthermore, in
her timeline quoted above, plaintiff mixes in dates concerning
both Joseph's EEOC action and her winning of awards, thereby
creating confusion as to what is actually causing the perceived
adverse actions of which she complains.  Finally, plaintiff can
show little, if any, temporal connection to the action which
could most be considered adverse: her transfer to Melear.
Plaintiff's email to Saxton requesting the transfer was sent on
June 3, 2009, and she accepted such transfer on June 6, 2009.
Def.'s Br. at 6; Def.'s App. at 57.  Thus, by June 6, 2009,
plaintiff was aware that she would be laterally transferred to
Melear, and she knew from the RIF letter she had received in May
that the effective date of her CRC position loss was August 28,
2009.  Accordingly, the fact that she was told to report to
Melear on September 3, 2009, shows no connection to plaintiff's
involvement in Joseph Hudson's case.

     Plaintiff cites Shirley v. Chrysler First, Inc., 970 F.2d
39, 42 (5th Cir. 1992), Fabela v. Socorro Independent School
District, 329 F.3d 409 (5th Cir. 2003), and Mitchell v. Iowa

<u>Protection & Advocacy Services</u>, 325 F.3d 1011 (8th Cir. 2003),
for the notion that a causal connection can be established by
mere temporal proximity; however, each case she cites requires
more.  For example, the <u>Shirley</u> court did find that the district
court was not clearly erroneous in finding retaliation, but that
case involved a plaintiff whose supervisor mentioned her EEOC
complaint "at least twice a week," made "disparaging comments"
about such complaint, and "'harassed' [her] to death about it."
<u>Shirley</u>, 970 F.2d at 43.  In <u>Fabela</u>, the Fifth Circuit held that
a reasonable jury could find a causal connection when the
employer referred to the plaintiff as a "problem employee"
because the plaintiff had previously filed an "unsubstantiated"
EEOC complaint, and the plaintiff was terminated for being a
"problem employee."  <u>Fabela</u>, 329 F.3d at 417.  <u>Mitchell</u>, an
Eighth Circuit case, while stating that a causal connection may
be proved circumstantially in some cases, actually holds that the
plaintiff in that case "did not create a genuine issue of
material fact regarding whether her purportedly protected action
was causally connected to her termination."  <u>Mitchell</u>, 325 F.3d
at 1015.

Accordingly, plaintiff cannot establish a causal connection
between protected activity and adverse employment action, and
therefore cannot establish a prima facie case for retaliation.

C.   Hostile Work Environment

Plaintiff contends she was subjected to a hostile work environment based on her gender, and defendant argues that plaintiff cannot establish a prima facie case for such a claim because any harassment she faced was not based on her gender, and, even if it were based on gender, the harassment was not sufficiently severe or pervasive to rise to the level of a hostile work environment.  To make a prima facie showing of a hostile work environment, plaintiff must establish (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her membership in the protected class; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action.  Harvill v. Westward Commc'ns, LLC, 433 F.3d 428, 434 (5th Cir. 2005).  When the alleged harassment is perpetrated by a supervisor with immediate or successively higher authority, the employee need only satisfy the first four of the elements stated above.  Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. 1999).

Plaintiff, as a female, is a member of a protected class, and it is clear from the record that she was subjected to unwelcome harassment to some degree, satisfying the first two elements.  However, defendant claims that plaintiff cannot sufficiently establish that such harassment was based on her

status as a female or that such harassment rose to the level of affecting a term, condition, or privilege of employment.  The court agrees with defendant, and concludes that plaintiff cannot sufficiently connect the treatment she endured to her status as a female.

Defendant correctly states that the primary factor that must persist in a hostile work environment claim is whether the hostility is a result of discrimination.  Def.'s Br. at 22; e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (providing examples).  The courts cannot police every workplace for rudeness, unfairness, or poor treatment of employees, and not every situation involving strife constitutes gender-based harassment.  See White v. Gov't Emps. Ins. Co., 457 F. App'x 374, 380 (5th Cir. 2012) (finding that "most of the incidents" alleged by a plaintiff indicated strife between the plaintiff and her supervisors and co-workers, but were not evidence of discriminatory harassment because they could not be properly characterized as race-based).  Defendants concede that Saxton "was an equal opportunity offender when it came to his treatment of subordinates" and "treated all of his subordinates to his cantankerous attitude equally," and that male as well as female subordinates were "subjected . . . to his ire."  Def.'s Br. at 12, 22-23; Def.'s App. at 74-75 (describing instances of Saxton's rude and threatening treatment of both male and female

employees).

Plaintiff provides descriptions of instances in which she was subjected to perceived mistreatment by Saxton; however, she has not provided any evidence that can relate such mistreatment to her status as a female.  For example, when Saxton held a meeting to determine what had happened to the stamps, plaintiff states that she was "yelled at" and that Saxton stated, "I want to know what you did with that money and those stamps."  Pl.'s Br. at 4.  Plaintiff contends:

> Plaintiff was not the employee in charge of the stock.
> Plaintiff was not the only employee that had access to
> the stock. But Plaintiff was the only one confronted,
> yelled at, and accused of stealing by Saxton.  The
> audit had not been correctly done as policy dictated.
> If the initial audit shows a shortage, then a second
> audit had to be immediately done.  That second audit
> had not been done.  Saxton informed Plaintiff she would
> be responsible for the $4,000 shortage.  Plaintiff did
> her own investigation and uncovered that the shortage
> was because of a mistake done by [another person] and a
> clerk returning stock.  When plaintiff informed Saxton
> of the mistake he acted disappointed that he could not
> fire her and he took no action against the employees
> who had made the mistake.

Pl.'s Br. at 4.  While plaintiff's contentions, if true, show that Saxton disliked her and treated her rudely and disrespectfully, plaintiff does not provide any evidence that could support her contention that such rudeness and disrespect occurred as a result of her gender.  Also, she provides only conclusory statements in support of her theory that a gender-based hostile work environment existed.  Defendant contends that

plaintiff "only mentions two plausibly gender-based incidents in her complaint," that Saxton engaged in "discriminatory treatment. . . of female managers under his supervision," and that she was accused of stealing and had her job threatened while in a locked room with four male managers. Def.'s Br. at 23; Def.'s App. at 82.

Plaintiff points to a report by the USPS Inspection Service, which states that an anonymous male USPS employee reported that Saxton used "disparaging language about female supervisors calling them 'bitch' and demeaning them when speaking to other supervisors," and that "Saxton, on several occasions, pounded on his desk with his fists while screaming at subordinates." Pl.'s App. at 36. The report also describes an anonymous call from a female employee, advising that Saxton was attempting to have plaintiff terminated because of the award she had won, and that Saxton "frequently treats supervisors in a disrespectful manner and uses threatening and demeaning language." Id. Later in the report, another anonymous call is described, advising that Saxton was "acting unprofessionally and creating a hostile work environment," that he was mistreating employees, and that employees were scared of retaliation should they report his behavior. Id. at 37. The same caller provided ten names of individuals who could attest to Saxton's actions: six females and four males. Id. There is no mention of gender or discrimination

in the description of that call.

Plaintiff also attempts to rely on vague statements from co-workers, particularly a letter written by Judy Ruiz ("Ruiz"), another SCS.  Such letter, directed "To Whom It May Concern," complains about Saxton's treatment of Ruiz generally, and refers to an instance in which she believes she was treated unfairly and less favorably than a male employee.  Pl.'s App. at 46.  Ruiz also alleges that females are punished more harshly than males and their jobs are threatened more frequently.  Id.  Such unsubstantiated claims cannot constitute the type of evidence necessary to show that plaintiff herself was discriminated against because of her gender.

While the record reflects that Saxton's behavior could be intimidating and reprehensible, and that he clearly did not particularly care for plaintiff or hold her in high regard, there is no evidence sufficient to raise a genuine issue of material fact that his dislike for her and actions toward her resulted from her status as a female.  Defendant points to similar cases in which a plaintiff has brought "a litany of allegations" of objectionable behavior, but such behavior could not reasonably be tied to a protected status, and the claims failed.  Def.'s Br. at 24.  See Cavalier v. Clearlake Rehab. Hosp., Inc., 306 F. App'x 104, 107 (5th Cir. 2009) (finding that a subjective belief of discrimination, without more, is not sufficient to show a hostile

work environment).  Thus, plaintiff fails to satisfy at least one
essential element of her claim for gender-based hostile work
environment, and therefore summary judgment is appropriate on
this claim.

D. <u>Sex Discrimination</u>

The <u>McDonnell Douglas</u> framework is also applied in the
context of discrimination, when a claim is based on
circumstantial evidence, as is the case here.  Thus, plaintiff
must first make out a prima facie case for discrimination.  If
plaintiff can do so, defendant must articulate a legitimate, non-
discriminatory reason for terminating her.  If defendant meets
this burden, plaintiff must show that defendant's reason is a
"pretext for discrimination." <u>Jackson v. Watkins</u>, 619 F.3d 463,
466 (5th Cir. 2010).  In showing pretext, plaintiff must "put
forward evidence rebutting each of the nondiscriminatory reasons
the employer articulates." <u>Wallace v. Methodist Hosp. Sys.</u>, 271
F.3d 212, 220 (5th Cir. 2001).  To establish a prima facie case
for discrimination, plaintiff must show (1) she is a member of a
protected class; (2) she was qualified for her job; (3) she was
subjected to an adverse employment action; and (4) she was
treated less favorably than similarly situated individuals
outside the protected group. <u>Okoye v. Univ. of Tex. Health Sci.</u>
<u>Ctr.</u>, 245 F.3d 507, 512-13 (5th Cir. 2001).

Defendant concedes that plaintiff meets the first two prongs

to establish a prima facie case, as she is a female and she had performed successfully as a CRC for a number of years, and appears to have had no record of disciplinary issues or poor performance prior to the events at issue in this lawsuit. Def.'s Br. at 27. Defendant, however, argues that plaintiff was not subjected to an adverse employment action and that she was not treated differently from others.

1. Adverse Employment Action

For a discrimination claim, the definition of an adverse employment action is more narrow than it is for a retaliation claim, and such adverse action includes only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 64 (broadening the standard for adverse employment action in retaliation claims, but not for discrimination claims); McCoy v. City of Shreveport, 492 F.3d 551, 560 (5th Cir. 2007) ("[O]ur precedent recognizing only 'ultimate employment decisions' as actionable adverse employment actions remains controlling for discrimination claims.") (emphasis in original). Every decision made by an employer that "might have some tangential effect upon future ultimate employment decisions is not actionable," Mattern v. Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir. 1997), and "[a]n employment action that does not affect job duties, compensation, or benefits" is not an ultimate

employment action, <u>Hunt v. Rapides Healthcare Sys., LLC</u>, 277
F.3d 757, 769 (5th Cir. 2001). Finally, the standard is an
objective one. <u>Burger v. Cent. Apartment Mgmt., Inc.</u>, 168 F.3d
875, 879 (5th Cir. 1999).

Defendants contend that the only actions that can plausibly
be argued as adverse are plaintiff's transfers to Melear and then
to Richardson, and the court agrees. Plaintiff's remaining
grievances regarding investigative interviews, the letter of
warning, increased surveillance, poor treatment by Saxton, his
recommendation of her removal, and the offensive email plainitff
received,[6] cannot meet the standard for adverse employment
actions in the context of a discrimination claim, as they do not
constitute ultimate employment decisions. As for plaintiff's
transfer to Melear, it is a closer call, as her original position
was eliminated, and the transfer did affect her job duties and
place her in a position in which she was unfamiliar with such
duties. However, the SCS position was not objectively a less
prestigious position, did not affect plaintiff's compensation or
benefits, and did not appear to affect any future opportunities
for advancement she may have had. Plaintiff claims that she was
pressured and bullied into applying for such transfer to Melear,

---

[6] Plaintiff complains about the email she received from Jeffcoat that she regarded as offensive,
in the context of her gender discrimination claim; however, the court finds that such an isolated and
insignificant email cannot form the basis of any kind of claim plaintiff is pursuing.

but she produces no evidence to support this contention.[7] She also claims that the SCS position was a "lesser" position, but again provides nothing to substantiate this contention and, in any event, her own subjective belief that the SCS position was less desirable cannot affect whether it constitutes an adverse employment action for a discrimination claim. There is no evidence that an SCS position is any less prestigious than a CRC position, as both had the same compensation and benefits. With no objective evidence indicating that plaintiff's lateral transfer to Melear was an ultimate employment decision, the court cannot find that such transfer was an adverse employment action for purposes of discrimination.

Plaintiff's subsequent transfer from Melear to Richardson is mentioned by defendant and plaintiff in their respective briefs and by plaintiff in her declaration in her appendix; however, there is little discussion of such transfer in either brief, or in the record. There is also no evidence that such transfer was involuntary, other than plaintiff's assertion that she applied for the transfer in order to escape Saxton, and no evidence that the transfer affected plaintiff's compensation or benefits.

---

[7] For example, plaintiff claims that Saxton forced her to email him a request for the transfer to Melear, that he did not approve of her original email to him requesting such transfer, and that he required her to revise the email and re-send it to him. Pl.'s Br. at 3. However, plaintiff included only one email to Saxton requesting her transfer in her appendix, the same email included by defendant in his appendix. Pl.'s App. at 26; Def.'s App. at 57. Thus, plaintiff has provided no evidence sufficient to create a genuine issue of material fact that her transfer was not voluntary.

Plaintiff alludes to stress-related health problems, a car accident that occurred as a result of her passing out while returning from work, and being forced to taking an early retirement, but nothing further is discussed with regard to such retirement.  Accordingly, plaintiff's transfer to Richardson and subsequent retirement also cannot constitute adverse employment actions for purposes of discrimination.

    2.   <u>Comparison to Similarly Situated Employees</u>

Even if plaintiff's lateral transfer to Melear could have constituted an adverse employment action, she also fails to satisfy the fourth element of a discrimination claim, that she was treated less favorably than similarly situated individuals outside the protected group.  Plaintiff must demonstrate that Saxton treated her less favorably than other employees who were not members of the protected class under "nearly identical circumstances."  <u>Lee v. Kan. City S. Ry. Co.</u>, 574 F.3d 253, 259 (5th Cir. 2009).  To be considered similarly situated, a comparable employee must have held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and had similar disciplinary or violation histories.  <u>Lee</u>, 574 F.3d at 259-60.

Defendant again relies on the argument that Saxton was equally rude and offensive to all subordinates, but also notes that plaintiff does not provide any evidence of a similarly

situated employee who was treated more favorably than she was under nearly identical circumstances. Plaintiff contends that she was the only CRC to lose her job due to RIF, that there were three other CRCs "in a 50 mile radius in level 26 offices with less time and experience" than plaintiff who did not lose their jobs. Pl.'s Br. at 11. However, plaintiff provides no evidence or support for these allegations: she does not clarify whether Saxton was the supervisor of the other CRCs, nor does she identify the other CRCs or provide any verifiable evidence regarding their alleged seniority or disciplinary records. Simply claiming in such a conclusory manner that others retained their jobs while she was laterally transferred cannot raise a genuine issue of material fact sufficient to withstand summary judgment. Furthermore, plaintiff also asserts that "the men supervisors under Saxton's management were given higher level positions even when the positions they were placed into were not authorized." Id. at 12. Again, plaintiff does not provide explanation, evidence, or documentation to support such an assertion, nor can she show that she and the other supervisors were similarly situated under identical circumstances. Accordingly, the court concludes that plaintiff has failed to establish a prima facie case for gender discrimination claim, and summary judgment for the defendant is appropriate.

V.

Order

Therefore,

The court ORDERS that defendant's motion for summary judgment be, and is hereby, granted, and that all claims and causes of action brought by plaintiff against defendant be, and are hereby, dismissed with prejudice.

SIGNED October 31, 2012.

JOHN McBRYDE
United States District Judge